PRESENT: All the Justices

JESSICA SHOEMAKER, ADMINISTRATOR
AND PERSONAL REPRESENTATIVE OF THE
ESTATE OF GINA ANGELA SHOEMAKER

OPINION BY
v. Record No. 191218                             JUSTICE STEPHEN R. McCULLOUGH
                                                 March 25, 2021

RICHARD E. FUNKHOUSER, ET AL.


FROM THE CIRCUIT COURT OF SHENANDOAH COUNTY
Clifford Lynwood Athey, Jr., Judge

Gina Angela Shoemaker was accidentally shot and killed while visiting her mother. The

shooter was himself visiting his grandparents, Richard E. and Anna E. Funkhouser ("the

Funkhousers"), who, according to the allegations in the complaint, gave him permission to shoot

in the direction of the house Shoemaker was visiting. Shoemaker's administrator filed suit

against the Funkhousers, asserting they were negligent in granting permission to their grandson

to shoot in this manner. The Funkhousers filed a demurrer, arguing that Shoemaker's lawsuit

failed as a matter of law because they owed Gina Shoemaker no legal duty. The trial court

agreed with the Funkhousers and dismissed the case. We conclude that, on the specific

allegations of this complaint, the judgment below should be reversed and the case remanded.

## BACKGROUND

The circuit court dismissed this case on a demurrer. In that circumstance, we accept the

allegations of the complaint as true. Richard and Anna Funkhouser live in Shenandoah County,

at 37 Charlotte Road, on a property of almost eight acres. Dorothy Nesselrodt is a neighbor of

the Funkhousers. Nesselrodt resides at 259 Charlotte Lane.

Nesselrodt is the mother of Gina Shoemaker. Shoemaker was visiting her mother at her house on November 23, 2014, when the Funkhousers were receiving a visit from Shawn Jason Nicely, their grandson.

According to the complaint, the Funkhousers gave Nicely permission "to shoot targets with a rifle on the Funkhouser property in the direction of 259 Charlotte Lane, at a firing position within sight of the Funkhouser home." The Funkhousers knew that Nesselrodt's house "was on the other side of trees, which were not densely arranged." The Funkhousers "knew, or should have known, that the firing of a rifle in the direction of the residence at 259 Charlotte Lane would go around or penetrate through the trees and result in bullets/ammunition striking such residence and anyone located therein." One of the bullets did penetrate the walls of Nesselrodt's house, striking Shoemaker and killing her.

Jessica Shoemaker, the administrator and personal representative of Gina Shoemaker, filed a wrongful death action against the Funkhousers. The complaint, which was amended several times, alleged that the Funkhousers owed a duty to refrain from granting Nicely permission to shoot a rifle from their property in the direction of Nesselrodt's house, and that they were negligent in granting him this permission. The Funkhousers filed a demurrer, contending that the complaint was barred because the Funkhousers did not owe Nesselrodt or any of her visitors a duty, and, in addition, the immunity afforded to landowners by the Recreational Land Use Act, Code § 29.1-509, foreclosed the suit. The circuit court agreed with the Funkhousers, sustained the demurrer, and dismissed the case. This appeal followed.

ANALYSIS

I.      LANDOWNERS HAVE A LIMITED DUTY IN TORT TO PREVENT ACTIVITY ON THEIR PROPERTY THAT COULD HARM OTHER PERSONS NOT ON THE PROPERTY.

"The question of liability for negligence cannot arise at all until it is established that the [individual] who has been negligent owed some duty to the person who seeks to make him liable for his negligence." *Dudley v. Offender Aid & Restoration of Richmond, Inc.*, 241 Va. 270, 277 (1991) (quoting *Le Lievre v. Gould* [1893] 1 Q.B. 491, 497 (Eng.) (opinion of Esher, M.R.)). "'[W]hether a legal duty in tort exists is a pure question of law'" to be reviewed de novo. *Burns v. Gagnon*, 283 Va. 657, 668 (2012) (quoting *Kellermann v. McDonough*, 278 Va. 478, 487 (2009)).

We have frequently grappled with the question of whether a duty exists on a particular set of facts. *See, e.g.*, *Quisenberry v. Huntington Ingalls Inc.*, 296 Va. 233, 249 (2018); *RGR, LLC v. Settle*, 288 Va. 260, 276 (2014). "General negligence principles require a person to exercise due care to avoid injuring others." *RGR, LLC*, 288 Va. at 275. Specifically, the common law requires that "'every person [must] exercise ordinary care in the use and maintenance of his own property to prevent injury to others.'" *Quisenberry*, 296 Va. at 242 (quoting *Perlin v. Chappell*, 198 Va. 861, 864 (1957)). The duty, however, is "not abstract: a specific course of conduct gives rise to a specific duty extending to specific persons." *Id.*

We have also stated that "'in determining whether a duty exists, the likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing that burden on the defendant must be taken into account. Imposition of a duty does not depend upon foreseeability alone.'" *Gulf Reston, Inc. v. Rogers*, 215 Va. 155, 159 (1974) (quoting *Trice v. Chicago Hous. Auth.*, 302 N.E.2d 207, 209 (Ill. App. Ct. 1973)).

3

As a general proposition, "the occupier of land must use reasonable care for the safety of those outside the land to prevent direct harm resulting from his affirmative activities on the land." 2 Dan B. Dobbs, The Law of Torts § 272 (2d ed. 2011).[1]  A landowner

> has the privilege to make use of the land for his own benefit, and according to his own desires, which is an integral part of our whole system of private property; but it has been said many times that this privilege is qualified by a due regard for the interests of others who may be affected by it.  The possessor's right is therefore bounded by principles of reasonableness, so as to cause no unreasonable risks of harm to others in the vicinity.

W. Page Keeton et al., Prosser & Keeton on Torts § 57 (5th ed. 1984); *see also* Restatement (Second) of Torts § 371 (1965) ("A possessor of land is subject to liability for physical harm to others outside of the land caused by an activity carried on by him thereon which he realizes or should realize will involve an unreasonable risk of physical harm to them under the same conditions as though the activity were carried on at a neutral place.").

That duty, however, generally applies to the occupier of the land, not to third parties who may be on the land.  In general, an owner or occupier of land has no duty to protect others from the harmful acts of a third person acting on or near their property.  *See* Restatement (Second) of Torts § 315 (1965); *Burns*, 283 Va. at 668 ("We have consistently held that 'generally a person does not have a duty to protect another from the conduct of third persons.'") (internal citations omitted).  Section 315 of the Second Restatement of Torts recognizes the general principle that "[t]here is no duty so to control the conduct of a third person as to prevent him from causing

---

[1] Although we employ the term "landowner" in this opinion, the duty we discuss springs from *possession* of the land, and it is not necessarily placed on the person in whom the land is *titled*.  *See* W. Page Keeton et al., Prosser and Keeton on Torts § 57 (5th ed. 1984) ("Largely for historical reasons, the rights and liabilities arising out of the condition of land, and activities conducted upon it, have been concerned chiefly with the *possession* of the land, and this has continued into the present day.") (emphasis added).

4

physical harm to another unless (a) a special relation exists between the actor and the third

person . . . , or (b) a special relation exists between the actor and the other . . . ."[2]

Furthermore, a person has a right to presume others will exercise due care "until the

contrary appears." *Harris Motor Lines v. Green*, 184 Va. 984, 992 (1946); *see also* Prosser &

Keeton on Torts § 33 ("In general, where the risk is relatively slight, a person is free to proceed

upon the assumption that other people will exercise due care."); *Jorgensen v. Horton*, 206

N.W.2d 100, 105 (Iowa 1973) ("One may presume the due care of others until he knows or in the

exercise of reasonable care should know otherwise."); *Weavil v. Myers*, 90 S.E.2d 733, 737 (N.C.

1956) ("It is a well settled principle of law that a person is not bound to anticipate negligent acts

or omissions on the part of others; but, in the absence of anything which gives, or should give

notice to the contrary, he is entitled to assume and to act upon the assumption that every other

person will perform his duty and obey the law and that he will not be exposed to danger which

---

[2] We have often accepted the Second Restatement of Torts as authoritative. *Coward v. Wellmont Health Sys.*, 295 Va. 351, 360 (2018) ("The Restatement, therefore, authoritatively frames the issue before us."); *Forest Lakes Cmty. Ass'n, Inc. v. United Land Corp.*, 293 Va. 113, 132 (2017) (asserting that § 158 cmt. m of the Restatement (Second) of Torts is "a fair restatement of English common law, which is the law of this Commonwealth already, *see* Code § 1-200, and has been received as such as part of our common-law heritage…"); *Mansfield v. Bernabei*, 284 Va. 116, 125 (2012) ("[R]egarding the applicability of absolute privilege to communications preliminary to a proposed judicial proceeding, this Court adopts the rule expressed in the Restatement (Second) of Torts §§ 586, 587…"); *DurretteBradshaw, P.C. v. MRC Consulting, L.C.*, 277 Va. 140, 145 (2009) ("We find the commentary accompanying § 766 of the Restatement (Second) of Torts to be instructive."); *Koffman v. Garnett*, 265 Va. 12, 16 (2003) (citing the Restatement (Second) of Torts § 21 in defining the cause of action for an assault); *Didato v. Strehler*, 262 Va. 617, 628-29 (2001) (asserting the Restatement (Second) of Torts § 323 is an embodiment of the common law principle); *Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co., Inc.*, 254 Va. 408, 413 (1997) (citing § 766B of the Restatement (Second) of Torts for the standard of a tortious interference with a contract expectancy); *Nasser v. Parker*, 249 Va. 172, 178 (1995) ("In determining whether one has a duty concerning the conduct of a third person, we have considered Restatement §§ 315(a) and 319 together…"); *Chaves v. Johnson*, 230 Va. 112, 120 (1985) (relying on the Restatement (Second) of Torts § 766 to outline the contours of a cause of action for tortious interference with contract rights).

can come to him only from the violation of duty or law by such other person.").  Therefore, as a

general proposition, landowners who have granted permission to others to engage in certain

activities on their land face no liability from the independent acts of others.

The Second Restatement of Torts recognizes exceptions to these general principles for

relationships made "special" by virtue of the degree of control the actor/defendant is able to

exercise over the third party.[3]  Notably, § 318 of the Second Restatement of Torts recognizes that

a duty may arise between the landowner and those allowed on the land because of the

possessor's power of control over those allowed to enter.  *See also* Prosser & Keeton on Torts

§ 57.  If such a duty were to arise, the landowner would have to exercise reasonable care for the

protection of others, including "the power of control or expulsion which his occupation of the

premises gives him over the conduct of a third person who may be present, to prevent injury to

the visitor at his hands."  *Id.* at § 61.

Section 318 of the Second Restatement of Torts provides as follows:

> If the actor permits a third person to use land or chattels in his
> possession otherwise than as a servant, he is, if present, under a
> duty to exercise reasonable care so to control the conduct of the
> third person as to prevent him from intentionally harming others or
> from so conducting himself as to create an unreasonable risk of
> bodily harm to them, if the actor
>
> (a) knows or has reason to know that he has the ability to control
> the third person, and
>
> (b) knows or should know of the necessity and opportunity for
> exercising such control.

For the sake of completeness, we note that a caveat to § 318 further specifies:

---

[3] *See e.g.*, Restatement (Second) of Torts § 316 (duty of parent to control conduct of child); Restatement (Second) of Torts § 317 (duty of master to control conduct of servant); Restatement (Second) of Torts § 319 (duty of those in charge of persons having dangerous propensities); Restatement (Second) of Torts § 320 (duty of person having custody of another to control conduct of third persons).

> The Institute expresses no opinion as to whether there may not be a duty of reasonable care to control the conduct of the third person . . . where the actor, although not present, is in the vicinity, is informed of the necessity and opportunity of exercising such control, and can easily do so.

The drafters also provide the following comment to the caveat:

> No cases have been found bearing upon the [portion] of the Caveat [quoted above]. Since the basis of the liability is the possessor's responsibility for what is done upon his land, together with his opportunity for exercising control, it would appear that the same rule would be applied where he is not present, but is notified and is in a position to arrive promptly upon the scene.

Consistent with § 318 of the Second Restatement of Torts, we conclude that a landowner has a duty in tort to exercise reasonable care to control the conduct of a third party, who has been granted permission by the landowner to use the land, to prevent that third party from intentionally harming others or from conducting himself so as to create an unreasonable risk of bodily harm to others. That duty is circumscribed by several important limiting principles articulated in § 318, namely, the landowner (1) must be present, (2) knows or has reason to know that he or she has the ability to control the third person, and (3) the landowner knows or should know of the necessity and opportunity for exercising such control.

The fact that Nicely happened to be on the Funkhousers' land when he began shooting does not alone expose the Funkhousers to liability. Additionally, because landowners can expect someone on their land to exercise proper care, absent evidence to the contrary, the fact that a landowner grants permission to conduct an activity on the landowner's property with some risk of harm attendant to that activity does not expose the landowner to liability simply because permission was granted to engage in that activity.

This case was dismissed at the demurrer stage. "A demurrer accepts as true all facts properly pled, as well as reasonable inferences from those facts." *Steward v. Holland Family*

7

*Props., LLC*, 284 Va. 282, 286 (2012).  Accordingly, accepting those allegations as true, we note that the complaint does not simply allege that the Funkhousers gave permission to Nicely to shoot at targets on their land.  It specifically alleges that they granted permission "to shoot targets with a rifle on the Funkhouser property *in the direction of* 259 Charlotte Lane, at a firing position within sight of the Funkhouser home."  (Emphasis added).  The complaint further alleges that the Funkhousers knew that Nesselrodt's house "was on the other side of trees, which were not densely arranged."  Finally, the complaint alleges that the Funkhousers "knew, or should have known, that the firing of a rifle in the direction of the residence at 259 Charlotte Lane would go around or penetrate through the trees and result in bullets/ammunition striking such residence and anyone located therein."  Ordinarily, a landowner would have a much greater knowledge of the dangers that might be present from an activity, like shooting in a particular direction, than would a visitor who is granted such permission.  We conclude that the Funkhousers owed a duty to their neighbors not to grant permission for someone to shoot targets on their property in the direction of a house located within sight of their house when they knew or should know that the bullets are likely to strike that house.[4]

The allegations in the complaint satisfy the element of "presence" required by § 318 of the Second Restatement of Torts.  "Present" is defined as "being in one place and not elsewhere: being within reach, sight, or call or within contemplated limits: being in view or at hand: being before, beside, with, or in the same place as someone or something."  Webster's Third New International Dictionary 1793 (2002); *see also* Black's Law Dictionary 1432 (11th ed. 2019) (defining "presence" as "[t]he quality, state, or condition of being in a particular time and place,

---

[4] The complaint alleges that the weapon was a rifle.  Not every weapon presents the same danger.

8

particularly with reference to some act that was done then and there" and "[c]lose physical proximity coupled with awareness"). The term "presence" in the Restatement should be construed according to its ordinary meaning, and "present or presence" does not mean standing at the shoulder of the person engaging in the activity.[5] The allegations of the complaint are sufficient to show that the Funkhousers were present: they were physically present on their land when they granted permission, not just to conduct an activity, but to conduct that activity in a specific way, and they were present at their house when the activity was being conducted such that they could exercise oversight over the activity. In addition, the allegations in the complaint suffice to show that they could view the firing position from their home, that they had the ability to control their grandson, and that they knew or should have known of the necessity and opportunity for exercising such control. In short, the allegations in the complaint are sufficient, if proven, to state a legal duty the Funkhousers owed to persons in Nesselrodt's house.

---

[5] Presence, in other areas of the law, means more than being within arm's reach of another. For example, to be convicted of robbery, a perpetrator must take "with intent to steal, of the personal property of another, *from his person or in his presence*, against his will, by violence or intimidation." *Lebedun v. Commonwealth*, 27 Va. App. 697, 718 (1998) (citation omitted and emphasis added). "The phrase 'of the personal property of another, from his person or in his presence' has been broadly construed to include the taking of property from the custody or . . . the constructive possession of another." *Id.* at 719 (citation omitted) (robbery conviction upheld as occurring in the presence of the store manager victim even though the victim was sequestered in a separate room of the store when the items were taken). Additionally, a police officer may make a warrantless arrest for a misdemeanor if the offense is committed in the officer's presence. *Galliher v. Commonwealth*, 161 Va. 1014, 1021 (1933). "An offense is committed within the presence of an officer, within the meaning of this rule, when he has direct personal knowledge, through his sight, hearing, or other senses that it is then and there being committed." *Id.* In the will context, the statutory requirement that a will be attested in the presence of the testator "has been considered as done in his presence, if he was in a position from which he might, if he chose, see the witnesses subscribe without changing his situation" even though the testator was not in the same room. *Nock v. Nock*, 51 Va. (10 Gratt.) 106, 122 (1853).

9

II. THE RECREATIONAL LAND USE ACT DOES NOT IMMUNIZE THE FUNKHOUSERS.

The Funkhousers also contend that Virginia's recreational immunity statute immunizes them from liability. Like many states, Virginia has enacted a recreational immunity statute that provides immunity to landowners in certain circumstances. *See* Code § 29.1-509. *See generally* Michael S. Carroll, et al., *Recreational User Statutes and Landowner Immunity: A Comparison Study of State Legislation*, 17 J. Legal Aspects of Sport 163 (2007). This statute operates in derogation of the common law. We have previously observed that, "[u]nder settled principles of statutory construction, [s]tatutes in derogation of the common law are [themselves] to be strictly construed and not to be enlarged in their operation by construction beyond their express terms." *Wetlands Am. Tr., Inc. v. White Cloud Nine Ventures, L.P.*, 291 Va. 153, 165 (2016) (internal quotation marks omitted); *see also Isbell v. Commercial Inv. Assocs.,* 273 Va. 605, 613 (2007) (same); *Chesapeake & Ohio Ry. Co. v. Kinzer*, 206 Va. 175, 181 (1965) (same). Accordingly, along with a majority of courts that have considered similar statutes, we conclude that Virginia's recreational immunity statute should be strictly construed. *See Roeder v. United States*, 432 S.W.3d 627, 634 n. 7 (Ark. 2014) ("The majority of courts interpreting recreational-use statutes have held that, because recreational-use statutes are in derogation of common law and because they limit the duties of landowners, they must be strictly construed.") (collecting cases).[6]

Code § 29.1-509(B) provides that

> A landowner shall owe no duty of care to keep land or premises
> safe for entry or use by others for hunting, fishing, trapping,
> camping, participation in water sports, boating, hiking, rock
> climbing, sightseeing, hang gliding, skydiving, horseback riding,

---

[6] The General Assembly could have, but did not, include a directive to liberally construe the recreational immunity statute. *See, e.g.*, *Wilmet v. Liberty Mut. Ins. Co.*, 893 N.W.2d 251, 257 n. 6 (Wis. Ct. App. 2017) (noting the statement of legislative intent that "this legislation should be liberally construed in favor of property owners to protect them from liability").

foxhunting, racing, bicycle riding or collecting, gathering, cutting or removing firewood, for any other recreational use, for ingress and egress over such premises to permit passage to other property used for recreational purposes . . . .

This provision of the statute addresses the duty of a landowner to persons who come onto the landowner's property. Code § 29.1-509(B) is not relevant to this case, except insofar as it is referenced in Code § 29.1-509(C).

Code § 29.1-509(C) states in relevant part:

Any landowner who gives permission, express or implied, to another person to hunt, fish, launch and retrieve boats, swim, ride, foxhunt, trap, camp, hike, bicycle, rock climb, hang glide, skydive, sightsee, engage in races, to collect, gather, cut or remove forest products upon land or premises for the personal use of such person, or for the use of an easement or license as set forth in subsection B does not thereby:

. . . .

3. Assume responsibility for or incur liability for any intentional or negligent acts of such person or any other person, except as provided in subsection D.

In turn, subsection D provides, among other things, that a landowner can be liable for "gross negligence or willful or malicious failure to guard or warn against a dangerous condition, use, structure or activity." Code § 29.1-509(D).

First, the text of Code § 29.1-509(C), which provides immunity when a landowner grants another person permission to engage in certain activities, does not mention target shooting.[7]

---

[7] Courts in sister states have concluded that persons entering property to engage in activities distinct from those activities enumerated in the recreational use statute are not recreational users. For example, in *Smith v. Arizona Board of Regents*, the court found that jumping on a trampoline was not a recreational use covered by the Arizona statute. 986 P.2d 247, 252 (Ariz. Ct. App. 1999); *see also Sallee v. Stewart*, 827 N.W.2d 128, 153 (Iowa 2013); *Glorioso v. City of Kenner*, 285 So. 3d 601, 604-05 (La. Ct. App. 2019); *Quesenberry v. Milwaukee Cty.*, 317 N.W.2d 468, 471 (Wis. 1982).

11

Subsection C does mention hunting. But hunting and target shooting are different. The legislature made a choice to distinguish between certain activities. Moreover, the General Assembly chose not to include in subsection C a phrase such as "includes, but is not limited to" that would sweep in activities that are analogous to the listed activities. Subsection B of this statute, in contrast, *does* contain the phrase "any other recreational use." Subsection B addresses landowner liability for persons who are on the premises for recreational purposes and it is inapplicable here. Subsection C addresses situations when a landowner grants permission, express or implied, for a specified recreational activity. This difference in wording between subsection B and subsection C reflects a legislative choice.[8] We are bound to give effect to that choice when construing the statute. *See, e.g.*, *City of Richmond v. Va. Elec. & Power Co.*, 292 Va. 70, 75 (2016) ("[W]hen the General Assembly has used specific language in one instance, but omits that language or uses different language when addressing a similar subject elsewhere in the Code, we must presume that the difference in the choice of language was intentional."); *RGR, LLC v. Settle*, 288 Va. 260, 295 (2014) (same); *Zinone v. Lee's Crossing Homeowners Ass'n*, 282 Va. 330, 337 (2011) (same).

Strict construction of this immunity statute precludes us from implying terms not found in the text of the statute. The statute provides immunity when the landowner provides permission to engage in certain activities, but it does not extend to activities that are not listed, like target shooting. Second, pursuant to the language found in subsection C, the Funkhousers did not grant permission "*for the use of an easement or license* as set forth in subsection B." (Emphasis added). A license is "a right, given by some competent authority to do an act which

---

[8] Indeed, other states have included such phrases in their recreational immunity statutes. *See Sallee*, 827 N.W.2d at 138-41 (discussing various approaches states have taken in crafting their recreational immunity statutes).

12

without such authority would be illegal, a tort, or a trespass." *Bunn v. Offutt*, 216 Va. 681, 683 (1976) (internal quotation marks and citations omitted); *see also* Jon W. Bruce & James W. Ely, Jr., The Law of Easements & Licenses in Land § 11:1 (2020) ("A license is the permission to do something on the land of another that, without such authority, would be unlawful."). Subsection B addresses entry on land for the purpose of

> hunting, fishing, trapping, camping, participation in water sports, boating, hiking, rock climbing, sightseeing, hang gliding, skydiving, horseback riding, foxhunting, racing, bicycle riding or collecting, gathering, cutting or removing firewood, for any other recreational use . . . .

Code § 29.1-509(B). Largely parallel with subsection B, subsection C immunizes a landowner who gives permission for someone to

> hunt, fish, launch and retrieve boats, swim, ride, foxhunt, trap, camp, hike, bicycle, rock climb, hang glide, skydive, sightsee, engage in races, to collect, gather, cut or remove forest products upon land or premises for the personal use of such person . . . .

Subsection B also provides immunity for a landowner in situations of

> ingress and egress over such premises to permit passage to other property used for recreational purposes or for use of an easement granted to the Commonwealth or any agency thereof or any not-for-profit organization granted tax-exempt status under § 501(c)(3) of the Internal Revenue Code to permit public passage across such land for access to a public park, historic site, or other public recreational area.

In parallel with this provision from subsection B, subsection C provides immunity for a landowner who has granted permission for "the use of an easement or license as set forth in subsection B." It would make no sense to construe the word "license" to cover all the activities mentioned in subsection B. Doing so would render much of subsection C useless or superfluous. We disfavor a construction of statutes that renders any part of the statute useless or superfluous. *Owens v. DRS Auto. Fantomworks, Inc.*, 288 Va. 489, 497 (2014); *see also Loch Levan Land*

13

*Ltd. P'ship v. Bd. of Supervisors*, 297 Va. 674, 685 (2019) ("[W]e ordinarily resist a construction of a statute that would render part of a statute superfluous.") (quoting *Davis v. MKR Dev., LLC*, 295 Va. 488, 494 (2018)). This is consistent with the well-settled principle that "[i]t is not to be presumed that the legislature intended any part of [a] statute to be without meaning." *Postal Tel. Cable Co. v. Norfolk & Western R. R. Co.*, 88 Va. 920, 926 (1892). Additionally, Code § 29.1-509(C) expressly refers to a "license set forth in subsection B." But, unlike Subsection C, which speaks of giving "permission" for others to engage in certain activities on one's land, Subsection B includes no such language. In fact, subsection B expressly states that "the provisions of this subsection apply without regard to whether the landowner has given permission to a person to use their land for recreational purposes." This language further supports the conclusion that the "license set forth in Subsection B" cannot be a license to engage in one of the listed recreational activities.

Guided by these principles, the "easement or license" that subsection C incorporates by reference from subsection B is most naturally read to include "passage to other property used for recreational purposes" or "use of an easement granted to the Commonwealth or any agency thereof or any not-for-profit organization granted tax-exempt status under § 501(c)(3) of the Internal Revenue Code to permit public passage across such land for access to a public park, historic site, or other public recreational area." Code § 29.1-509(B).

In sum, the recreational immunity statute does not provide the Funkhousers with immunity in this situation because it does not, by its text, cover a situation when a landowner grants permission to shoot targets on the landowner's property.

CONCLUSION

We will reverse the circuit court's dismissal of the case and remand for further proceedings.

*Reversed and remanded*.

JUSTICE KELSEY, with whom CHIEF JUSTICE LEMONS and JUSTICE CHAFIN join, dissenting.

This appeal presents two questions. Does the common law impose a duty on the grandparents to supervise their adult grandson's target shooting on their property, and if so, does the recreational-use statute, Code § 29.1-509, immunize the grandparents from common-law liability for allegedly failing to do so? The majority concludes that the common-law duty exists and that the recreational-use statute should be strictly construed not to disturb it. I disagree with both conclusions.

I.

"Because this appeal arises from the grant of a demurrer, we accept as true all factual allegations expressly pleaded in the complaint and interpret those allegations in the light most favorable to the plaintiff." *Sweely Holdings, LLC v. SunTrust Bank*, 296 Va. 367, 370-71 (2018) (citation omitted). This Court "accept[s] as true unstated inferences to the extent that they are *reasonable*" but "give[s] them no weight to the extent that they are *unreasonable*." *Id.* at 371 (emphases in original) (citation omitted). "The difference between the two turns on whether 'the inferences are strained, forced, or contrary to reason,' and thus properly disregarded as 'arbitrary inferences.'" *Id.* (citation omitted). "We also 'distinguish allegations of historical fact from conclusions of law. We assume the former to be true arguendo, but we assume nothing about the

15

correctness of the latter because "we do not accept the veracity of conclusions of law camouflaged as factual allegations or inferences.""" *Id.* (citation omitted).

The decedent, Gina Shoemaker, was visiting her mother, Dorothy Nesselrodt, on the same day that Jason Nicely was at his grandparents' 7.856-acre property, which neighbors Nesselrodt's property. The grandparents, Richard and Anna Funkhouser, allegedly gave Nicely, their adult grandson, permission to shoot targets with his rifle on their property "in the direction of" Nesselrodt's residence. J.A. at 70. At some point while Nicely was outside firing his rifle, a bullet struck Nesselrodt's residence and killed Shoemaker. *See id.* The complaint asserts that Nesselrodt's residence "was on the other side of trees, which were not densely arranged," and at the time that Nicely was target shooting, "one or both" of the grandparents "were at the residence within view of the shooting." *Id.* at 72.

The administrator of Shoemaker's estate brought a wrongful death action, alleging that Shoemaker's death had resulted from the grandparents' negligence. The complaint alleges that

- the grandparents "had a duty to supervise an activity within their view";
- they "had the right to direct and govern the movements and conduct of . . . Nicely on their property" but "[n]onetheless, they allowed him to shoot in the known direction of 259 Charlotte Lane";
- the grandparents "placed themselves in such a position with regard to the decedent that if they did not use ordinary care in overseeing . . . Nicely's firing of his rifle where he did with regard to those circumstances, they would cause danger of injury or death"; and
- "ordinarily prudent persons would not have allowed the firing of a rifle on their property in the direction of [Nesselrodt's] residence."

*Id.* at 72-73. The grandparents filed a demurrer, arguing that they did not owe Nesselrodt or her visitor a duty to control Nicely or to warn or protect others from his wrongful actions. The

16

grandparents also argued that Virginia's recreational-use statute provides them with immunity from any simple-negligence claims arising from the actions of those that they permit to use their property for recreational uses. The circuit court sustained the grandparents' demurrer on these two independent grounds.

## II.

On appeal, the administrator challenges both circuit court rulings. She contends that the grandparents owed a duty to supervise Nicely's target shooting on their property and that the recreational-use statute does not shield the grandparents from liability. The majority finds these arguments persuasive. I do not.

### A. LANDOWNERS' DUTY TO SUPERVISE

Before addressing the governing common-law liability standards, it is important to clarify the allegations regarding the grandparents' specific actions or inactions. The complaint is artfully crafted, and the majority generously interprets it. Two critical factual allegations attempt to lay the foundation for the complaint's legal conclusion that the grandparents "had a duty to supervise an activity within their view that put their neighbors in grave danger," *id.* at 73.

The first factual allegation is that the grandfather "and/or" the grandmother "gave permission" to Nicely "to shoot targets with a rifle on [their] property in the direction of 259 Charlotte Lane [the home at which the decedent was visiting], at a firing position within sight of the [grandparents'] home." *Id.* at 70. The second factual allegation is that "*one or both* of the [grandparents] were at the residence within view of the shooting by . . . Nicely." *Id.* at 72 (emphasis added).

This is yet another case with a complaint liberally using the "and/or" semantic stratagem that we have described as an "'unfortunate hybrid' and 'a drafting blemish' because '[t]he literal

17

sense of and/or is "both or either,"' providing three possible choices: one, the other, or both."

*A.H. ex rel. C.H. v. Church of God in Christ, Inc.*, 297 Va. 604, 614 n.3 (2019) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 125 (2012)). The use of an "and/or" allegation is self-defeating and should be subject to demurrer on this basis alone. This syntactic trick forces a civil defendant to go to trial solely upon the allegation that (i) he is liable; *or* (ii) if not, someone else is liable; *or* (iii) perhaps even both are liable. The disjunctive between (i) and (ii) means that the defendant may or may not be liable. Yet he cannot escape the chokehold of litigation until trial. And, even then, if it becomes obvious no evidence has ever existed demonstrating the defendant's liability, the plaintiff can simply elect the "or" in the "and/or" list of options and disclaim that liability was ever asserted solely against that defendant. Imagine a criminal indictment stating that John Doe and/or Jane Doe are guilty as charged. Neither civil nor criminal rules permit such an undisciplined approach to pleading.

Because the grandparents did not attack this pleading defect in the trial court, I will treat the "and/or" and "one or both" allegations in the complaint as referring to both grandparents. Even with that indulgence, notice what is still missing from these allegations:

- The complaint does not allege that Nicely was inexperienced with firearms or that he had any negligent propensities that would caution the grandparents from letting him target shoot on their property.

- The complaint does not claim that the grandparents were *outside* in Nicely's *presence* while he was shooting. To the contrary, it alleges that one or both grandparents were "*at* the residence." *Id.* at 72 (emphasis added).

- The complaint conspicuously backs away from any allegation that the grandparents were looking through a window of their home and *actually saw* Nicely aim and fire his rifle. Instead, the complaint alleges only that the place on the 7.856-acre property where Nicely was shooting was "within sight" and "within view" of the home. *Id.* at 70, 72.

18

- The complaint does not allege that the grandparents gave Nicely permission to shoot *at* the home in which the decedent was visiting, but rather to shoot targets "*in the direction of*" that home, *id.* at 70 (emphasis added).

- The complaint does not assert that the grandparents knew or should have known the specific manner in which Nicely would be firing his rifle — whether into a berm, a ravine, or any other form of manmade or natural backstop.

- Nor is there any allegation that the grandparents should have anticipated that Nicely would negligently fire his rifle on a horizonal plane without any protection at all in the event that he either missed or shot through his intended target.

These missing details are important because their absence highlights the flaws in the majority's legal reasoning.

1.

The Commonwealth inherited from English common law a highly crafted set of rules governing premises liability. This centuries-old liability regime distinguishes between various categories: the nature of the visitor (invitee, licensee, or trespasser),[1] the nature of the danger (open and obvious or latent),[2] the origin of the danger (natural or man-made),[3] and the identity of

---

[1] *See generally Pearson v. Canada Contracting Co.*, 232 Va. 177, 182-83 (1986) (defining a "trespasser" as "one who unlawfully enters the land of another," a "licensee" as "one who enters for his own convenience or benefit with the knowledge and consent, express or implied, of the owner or occupier," and an "invitee" as "one who enters pursuant to the express or implied invitation of the owner or occupier other than for a social purpose or for his own convenience"); *John P. Pettyjohn & Sons v. Basham*, 126 Va. 72, 77-78 (1919) (distinguishing between the duties owed to trespassers, licensees, and invitees); William L. Prosser & W. Page Keeton, Prosser and Keeton on the Law of Torts § 58, at 393 (Dan B. Dobbs et al. eds., 5th ed. 1984) (describing the "rough sliding scale" from trespasser to licensee to invitee "by which, as the legal status of the visitor improves, the possessor of the land owes him more of an obligation of protection").

[2] *See Fultz v. Delhaize Am., Inc.*, 278 Va. 84, 89 (2009) (recognizing that a landowner has a duty to warn an invitee of latent dangers but not open and obvious dangers); *Fobbs v. Webb Bldg. Ltd. P'ship*, 232 Va. 227, 229 (1986) (same).

[3] *See, e.g.*, *Cline v. Dunlora S., LLC*, 284 Va. 102, 106, 109-10 (2012) (stating that under

the injured party (the visitor or a third party that the visitor injures). *See generally* Kent Sinclair,

Personal Injury Law in Virginia § 21.1, at 21-4 (4th ed. 2019). Both the existence of a duty of

care and the scope of that duty turn on these distinctions.

Under the common law, broad abstractions about duties owed to the world were

considered to be as inaccurate as they are misleading. "[T]here is no such thing as negligence in

the abstract, or in general, or as sometimes is said, in vacuo." *Kent v. Miller*, 167 Va. 422, 425-

26 (1937).

> The history of our common law, Justice Holmes reminded us, has
> made "clear that the featureless generality, that the defendant was
> bound to use such care as a prudent man would do under the
> circumstances, ought to be continually giving place to the specific
> one, that he was bound to use this or that precaution under these or
> those circumstances." "From the time of Alfred to the present day,
> statutes and decisions have busied themselves with defining the
> precautions to be taken in certain familiar cases; that is, with
> substituting for the vague test of the care exercised by a prudent
> man, a precise one of specific acts or omissions."

*Tingler v. Graystone Homes, Inc.*, 298 Va. 63, 80 (2019) (quoting Oliver Wendell Holmes, Jr.,

The Common Law 111-12 (1881)).

2.

The case before us is one of those "familiar cases," in which the common law has

rejected the "vague test" of a reasonably prudent man in favor of a "precise one" addressing

"specific acts or omissions," *id.* (citation omitted). Those acts or omissions here involve a very

specific allegation of premises liability — a landowner's alleged liability for the tort of a licensee

while on the landowner's property. In the absence of a "special relationship" between the

---

"common law, a landowner owed no duty to those outside the land with respect to natural
conditions existing on the land, regardless of their dangerous condition").

20

landowner and the licensee or the victim,[4] the common law imposes liability upon a landowner for the tort of a licensee only in limited circumstances.

No duty to control a licensee exists unless the landowner is *present* when the licensee commits the tort on the landowner's property. The First Restatement of Torts accurately restated the common-law rule recognizing a landowner's duty to "control the conduct" of the licensee only when the landowner is "present" with the licensee at the time of his conduct. Restatement of Torts § 318 (1934). The First Restatement viewed this limitation as a "necessary corollary" to a similar principle previously applied in a wide range of cases implicated by the common-law duty to control. *See* Restatement of Torts app. explanatory note to § 194D, at 91 (Proposed Final Draft No. 2, 1934) (explaining that the original Restatement rule placing a duty on the owner of land or chattels, *if present*, to control the conduct of a licensee is a "necessary corollary" to the cases holding that a possessor of a vehicle is a "participator" in the "negligent driving" of another if "the possessor was himself present in the vehicle while it was being driven" because the possessor "failed to prevent [the negligent driving] although he had the opportunity to do so").[5]

This limiting principle has survived the test of time. *See generally* 2 Dan B. Dobbs et al., The Law of Torts § 272, at 63-64 (2d ed. 2011) ("The landowner who is 'present' is under a duty to use reasonable care to control others on his land to prevent them from causing harm to

---

[4] *See, e.g.*, *A.H. ex rel. C.H.*, 297 Va. at 619-20 & n.7 (collecting cases); *Commonwealth v. Peterson*, 286 Va. 349, 356-57 (2013).

[5] *See, e.g.*, *Grant v. Knepper*, 156 N.E. 650, 650-52 (N.Y. 1927) (Cardozo, J.); *Kelley v. Thibodeau*, 115 A. 162, 162-63 (Me. 1921); *Strohl v. Levan*, 39 Pa. 177, 184-85 (1861); *M'Laughlin v. Pryor* (1842) 134 Eng. Rep. 21, 23; 4 Man. & G. 48, 52-53; *Chandler v. Broughton* (1832) 149 Eng. Rep. 301, 301; 1 C. & M. 29, 30. *See generally* 2 Francis Hilliard, The Law of Torts or Private Wrongs 527 (1859) ("A master may be held liable as a trespasser, for the act of his servant done *in his presence*." (emphasis in original)).

outsiders."); 4 J.D. Lee & Barry A. Lindahl, Modern Tort Law: Liability and Litigation § 38:13 (2d ed. 2002) (recognizing that a duty arises "*only* if the landowner is present" (emphasis added)). Only when the landowner is in the licensee's presence — personally observing his actions, judging the relative risks associated with them, and having the opportunity to immediately intervene if necessary to control the licensee's conduct — can the landowner be liable for the licensee's negligence.

The authors of the Restatement (Second) of Torts debated whether the common-law limitation of presence should be removed from the rule because it was not indispensable to liability. The Restatement Reporter could find no authority for doing so, however, and the Restatement (Second) of Torts again restated the common-law rule in its traditional form. Section 318 of the Restatement (Second) of Torts, entitled "Duty of Possessor of Land or Chattels to Control Conduct of Licensee," states:

> If the actor permits a third person to use land or chattels in his possession otherwise than as a servant, he is, *if present*, under a duty to exercise reasonable care so to control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the actor
>
> (a) knows or has reason to know that he has the ability to control the third person, and
>
> (b) knows or should know of the necessity and opportunity for exercising such control.

Restatement (Second) of Torts § 318 (1965) (emphasis added).

Immediately following this rule, the Restatement authors added a "Caveat" stating that "[t]he Institute expresses no opinion" on whether a duty to control a licensee may not exist when the landowner is "not present" but "in the vicinity" of the licensee when the licensee commits the tort and "is informed of the necessity and opportunity of exercising such control, and can easily

22

do so." *Id.* at caveat. A "Reporter's Note" following the "Caveat" and the comments, however, expressed no such inhibition. Despite acknowledging that "[n]o cases have been found" supporting the "in the vicinity" expansion of the common-law duty, the Reporter offered his personal opinion that "it would appear that the same rule would be applied where [the landowner] is not present, but is notified and is in a position to arrive promptly upon the scene." *Id.* at reporter's note.

The backstory for this rule-caveat-note triad illustrates the tension between accurately restating the common law and proactively attempting to reformulate it. The early drafts of Section 318 reveal that the Reporter desired to remove the "if present" requirement from the rule and to add a paragraph to Comment b stating that "presence is not indispensable to . . . liability." *See* Restatement (Second) of Torts § 318 (Tentative Draft No. 4, 1959); Restatement (Second) of Torts § 318 (Council Draft No. 5, 1958); Restatement (Second) of Torts § 318 (Preliminary Draft No. 4, 1956). During the annual meeting of the American Law Institute ("ALI") at which the Tentative Draft containing Section 318 was discussed, the Reporter's removal of "if present" from the rule was challenged, and the Reporter ultimately admitted that he did not know of any cases where the landowner had not been physically present. *See* ALI, *37th Annual Meeting*, 37 A.L.I. Proc. 202-04 (1960) [hereinafter ALI, *37th Annual Meeting*].

Under the ALI's governing principles, the Reporter's "in the vicinity" dictum should not be considered an authoritative restatement of the common law. Unlike the rule and comments in the Restatement, which are the "official product of the Institute" and "represent its institutional voice rather than the voice of the Reporter," the Reporter's Notes "are regarded as the work of the Reporter." ALI, Capturing the Voice of the American Law Institute: A Handbook for ALI Reporters and Those Who Review Their Work 42, 45 (2015) [hereinafter ALI, Capturing the

Voice]. "In addition, the Notes furnish a vehicle for the Reporter to convey views not necessarily those of the Institute and to suggest related areas for investigation that may be too peripheral for treatment in the black letter or Comment." *Id.* at 45.

To be clear, I believe that we should consider and rely upon the Restatement (Second) of Torts when it is "a fair restatement of English common law, which is the law of this Commonwealth already, *see* Code § 1-200, and has been received as such as part of our common-law heritage." *Forest Lakes Cmty. Ass'n v. United Land Corp. of Am.*, 293 Va. 113, 132 (2017) (footnote omitted). But no such reliance is prudent or justified when, "as sometimes seems to be the case," the Restatement Reporter inserts "innovation[s]" into his work that go beyond the task of merely restating existing law. *See McCulley v. Brooks & Co. Gen. Contractors, Inc.,* 295 Va. 583, 591-92 (2018). It is no secret that the "impulse to reformulate" existing law and thereby "subtly transform[] it" is "at the heart of the Restatement process." *Id.* at 592 n.7 (emphases omitted) (quoting ALI, Capturing the Voice, *supra*, at 4-11). The Reporter's Note for Restatement (Second) of Torts § 318 does just that — reformulates the existing common law and transforms it.

For this reason, I do not accept the Restatement Reporter's reformulation of presence into vicinity for the purpose of expanding a landowner's duty to control licensees. It is not for me to say though whether this reformulation should be the rule from a public policy point of view. As St. George Tucker emphatically warned: "In Virginia, it would be a violation of the constitution for the *courts* to undertake to supply all defects of the common law not already supplied by statute. That is the exclusive province of the *legislature*." 1 St. George Tucker, Blackstone's Commentaries, editor's app. note E, at 405 (1803) (emphases in original).

24

3.

At first blush, the majority appears to adopt as Virginia law the "if present" requirement of Section 318 of the Restatement (Second) of Torts. "For the sake of completeness," *ante* at 6, however, the majority quotes without further comment the Caveat and the Reporter's Note discussing the Reporter's "in the vicinity" dictum that the ALI purposefully refrained from adopting as an affirmative duty in Section 318. Although the word "vicinity" does not appear again in the majority opinion, the majority's "if present" analysis is truly completed by, and is indistinguishable from, the Reporter's "in the vicinity" dictum.

The majority begins its analysis with the assertion that the complaint alleges that the grandparents "were physically present on their land when they granted permission" for Nicely to target shoot. *Ante* at 9. To the contrary, the complaint (after being amended twice) does not allege that the grandparents were physically present on their property at the time they granted the alleged permission. Nor does the complaint allege that Nicely was physically present on the property when he received the alleged permission. For all we know, the permission could have been given by phone or text message to Nicely before he arrived and while the grandparents were at the grocery store or at a neighbor's house for lunch.

Even if those allegations had been made, it would not legally matter. The "if present" requirement historically referred to the landowner being in the presence of the licensee at the time of the tortious conduct not at the time of permission. *See, e.g.*, Restatement (Second) of Torts § 318 cmt. b ("The rule stated in this Section is applicable where the possessor . . . of land *is present when . . . the activity is being carried on* with his permission" (emphasis added)); 4 Lee & Lindahl, *supra*, § 38:13 (noting that the operative time is when the landowner is "present *at the time of the harmful conduct*" (emphasis added)). Indeed, the Restatement clarifies that

25

"[t]he mere fact that the possessor . . . of land permits a third person to . . . conduct an activity upon the land is not regarded as sufficient to make the possessor liable for the manner in which the third person . . . carries on the activity." Restatement (Second) of Torts § 318 cmt. a.

The majority concedes that the complaint does not allege that the grandparents were physically present with Nicely when he negligently aimed and fired his rifle horizontally and directly at a neighbor's house without an adequate backstop. Just the opposite is alleged — the complaint asserts that one or both grandparents were allegedly "present at their house" *elsewhere* on the 7.856-acre property. *See ante* at 9. But that is good enough, the majority reasons, because they might have seen Nicely at some point because "they could view the firing position from their home." *Ante* at 9. The complaint also does not allege that either grandparents ever once saw Nicely from the moment he arrived on the property until the moment of the fatal shot. But that conspicuous omission does not factor into the majority's reasoning.

The majority's reasoning assumes too much. If a police officer had asked Nicely if his grandparents were present with him when he fired the fatal shot, would any one of us criticize Nicely if he replied, "no, they were back at the house"? Surely not. The ordinary meaning of "presence" means "being in a particular time and place, particularly with reference to some act that was done then and there" and "[c]lose physical proximity coupled with awareness." Black's Law Dictionary 1432 (11th ed. 2019). In this case, the relevant "particular time and place" and the "act that was done then and there," *id.*, was the *time* of Nicely's fatal shot, the *place* where he pulled the trigger, and the tragic *act* that was done then and there.

The flaw in the majority's reasoning is that, in the context of the landowner's liability under Section 318 of the Restatement (Second) of Torts, the linguistic range of "if present" ends where "in the vicinity" begins. During the ALI debates concerning whether to remove the

26

Restatement rule's "if present" limitation, the Reporter advocated for the vicinity standard and argued that physical presence should not be indispensable to liability because "[t]he important thing" in the supporting caselaw is "not that [the landowner] was physically there instead of 20 feet off and behind a wall, not in the same room, but that he knew about it and that he was in a position to do something." ALI, *37th Annual Meeting*, *supra*, 203-04. The ALI rejected the Reporter's position because he could not cite any authority for it.[6] The reason for this rejection was clear: The common-law "if present" requirement means being physically present with the licensee at the time of the tort, not just being present somewhere else on the property in the vicinity of the licensee.

Though the Reporter lost that battle before the ALI, his self-fulfilling prophecy that a court would someday adopt his view was prescient. The majority has implicitly adopted the Reporter's "in the vicinity" dictum while claiming to apply the "if present" limitation in the ALI's restatement of common-law rule. I would leave the common law as we have found it. Absent a special relationship between the parties, no duty to control a licensee exists under the common law unless the landowner is present with the licensee when he commits the tort on the landowner's property. Being in the licensee's presence triggers the landowner's duties to personally observe the licensee's conduct, determine the level of risk associated with it, and

---

[6] The majority likewise cannot cite any authority for its expansive use of the "if present" requirement in the context of a landowner's liability for injuries caused by licensees. The attempt to do so, *ante* at 8-9, 9 n.5, can be easily sidelined because they address entirely different contexts. The majority cites a criminal case, *Lebedun v. Commonwealth*, which points out that "presence" under robbery law includes the theft of property in the victim's "custody" or "constructive possession." 27 Va. App. 697, 718-19 (1998) (citation omitted). The evidence in *Lebedun* involved an armed robbery in which the robbers forced the victim away from the cash register, put him into a storage room, and then emptied the cash register and narcotics cabinet. *Id.* at 719. The other two cites offered by the majority are similarly inapt. *See Galliher v. Commonwealth*, 161 Va. 1014, 1021 (1933) (addressing warrantless arrests); *Nock v. Nock's Ex'rs*, 51 Va. (10 Gratt.) 106, 122 (1853) (addressing will attestation).

intervene if and when that risk becomes unreasonable. In this case, if the grandparents had been in Nicely's presence when he aimed his rifle on a horizontal plane at a target unprotected by a natural or man-made backstop, they would have had a duty to intervene.

### B. THE VIRGINIA RECREATIONAL-USE STATUTE

Even if the common law does impose a duty upon the grandparents, the majority unsuccessfully defends its extension of tort liability against the immunity that Virginia's recreational-use statute, Code § 29.1-509, expressly grants. That statute promotes a broad public policy that the General Assembly has expressly and progressively advanced for nearly half a century. With certain exceptions, landowners should not be liable for simple negligence of recreational users who use their land. The plain language of Code § 29.1-509 — reinforced by an examination of the "context and the history of the provision," *Tilton v. Commonwealth*, 196 Va. 774, 785-86 (1955) — refutes the majority's view that hunters are covered by *both* subsections B and C of Code § 29.1-509 but that target shooters are *only* covered by subsection B.

### 1. Plain Meaning v. Strict Construction

First enacted in 1962, Virginia's recreational-use statute crafted a symmetry between a landowner's liability to recreational users of the property, a form of user immunity, and the landowner's corresponding liability to nonusers for negligent acts by those users, a form of third-party immunity. The specific task in this case is to interpret the 2010 amendment extending the landowner's third-party immunity from liability for the negligent acts of users of a "license as set forth in subsection B." Code § 29.1-509(C). This language is clear and its syllogism irrefutable:

- Someone with a *license* to enter property is a *licensee*.
- Subsection B covers recreational uses by a host of specific licensees (hunters, skydivers, campers, foxhunters, hang

28

gliders, inter alia) followed by a catch-all category for "any other recreational" licensees.

- A target shooter is an "other recreational" licensee.
- Subsection C incorporates the use of all *licenses* mentioned in subsection B.
- Therefore, subsection C applies to target shooters through incorporation of the licenses mentioned in subsection B.

The majority's fissured response to this plain reading of Code § 29.1-509 is predicated on the canon requiring a strict construction of ambiguous statutes that attempt to change the common law. *See ante* at 10. I agree that this venerable principle has been part of the Commonwealth's legal tradition since our founding.[7] To be sure, English common law is the sea anchor that protects our interpretative task from the inconstant jurisprudential gales that blow through our law from time to time. In this case, however, the majority's use of the strict-construction canon is flawed.

Under settled law, Virginia courts presume that statutes do not "change the common law unless the legislative intent to do so is plainly manifested." *Isbell v. Commercial Inv. Assocs., Inc.*, 273 Va. 605, 613 (2007) (citation omitted). The strict-construction canon requires that we read the statute as a whole to determine whether the legislature "plainly manifest[ed] an intention, either through express language or by necessary implication, to abrogate the common law." *Id.* at 618. Either method — "express language" or "necessary implication," *id.* — suffices to rebut the presumption. Both are present here.

---

[7] *See, e.g.*, *In re: Brown*, 295 Va. 202, 208 & n.1 (2018); *Tvardek v. Powhatan Vill. Homeowners Ass'n*, 291 Va. 269, 274 & n.1 (2016); *Dennos v. Commonwealth*, 63 Va. App. 139, 146-47 & n.4 (2014); *Ferrell v. Commonwealth*, 62 Va. App. 142, 145 (2013); *Taylor v. Commonwealth*, 58 Va. App. 435, 443-44 (2011). *See generally* D. Arthur Kelsey, *The Commonwealth's Common Law*, VBA J., Winter 2013-2014, at 26, 26-30.

a. Reading the Statute as a Whole — Express Language

When a statute does not define a specific term, "we look to the common law definition of the term." *Carter v. Commonwealth*, 269 Va. 44, 46 (2005).[8] "[A]s Justice Frankfurter colorfully put it, 'if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.'" *Sekhar v. United States*, 570 U.S. 729, 733 (2013) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947)). That old soil is composed of the "accumulated settled meaning" given to the term by the common law. *Nationwide Mut. Ins. v. Darden*, 503 U.S. 318, 322 (1992) (citation omitted).

The disputed word in the 2010 amendment to Code § 29.1-509(C) — *license* — brought quite a lot of common-law soil with it. Under the common law governing real property, a license has a specific meaning. *See* 3 James Kent, Commentaries on American Law 453 & n.(e) (Oliver Wendell Holmes, Jr. ed., 12th ed. 1873); Sir Frederick Pollock, The Law of Torts 378 (8th ed. 1908); R.F.V. Heuston, Salmond on the Law of Torts § 29, at 113 (7th ed. 1923). A "license" is a form of permission that "may be given by any words, either written or spoken, which manifest consent" by a landowner for another to enter his property. Restatement (Second) of Torts § 330

---

[8] This concept is not unique to Virginia law. "[I]t is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses." *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1999 (2016) (citation omitted); *see also Neder v. United States*, 527 U.S. 1, 23 (1999) (applying "the rule that Congress intends to incorporate the well-settled meaning of the common-law terms it uses"); *Morissette v. United States*, 342 U.S. 246, 263 (1952) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.").

cmt. d.[9]  By definition, those given a license are licensees.  *See* Black's Law Dictionary, *supra*, at 1105; 2 John Bouvier, A Law Dictionary 46 (10th rev. ed. 1860).  A "bare licensee" is "one who is permitted by the passive acquiescence of the owner to come on his premises for his own convenience."  *Appalachian Power Co. v. LaForce*, 214 Va. 438, 441 (1974) (citation omitted).

The potential list of licensees includes many categories of property users.  The broadest category is a "[s]ocial guest," Restatement (Second) of Torts § 330 cmt. h, which includes a friend, family member, or other social acquaintance who enters and uses the property with the landowner's permission.  In *Bradshaw v. Minter*, we recognized that "the prevailing common-law view is that 'a social guest, however cordially he may have been invited and urged to come, is not in law an invitee, but is nothing more than a licensee.'"  206 Va. 450, 452-53 (1965) (citation omitted)); *see also Bauer v. Harn*, 223 Va. 31, 37 (1982) (recognizing a "social guest" as a "licensee"); *Reagan v. Perez*, 215 Va. 325, 326 (1974) (same); *Busch v. Gaglio*, 207 Va. 343, 346 (1966) (same).  Licensees also include those "hunting and fishing on the land with the tacit or implied permission of the landowner," those "taking a 'short cut' over the land of another

---

[9] *See also* Restatement (Second) of Torts § 330 cmt. d ("If the possessor so speaks as to give to another reason to believe that he consents to the other's entry upon his land, such person is a licensee although the possessor did not intend his words to be understood as expressing consent to the licensee's entry."); *id.* at cmt. e ("The consent which is necessary to confer a license to enter land, may be expressed by acts other than words. . . . [T]he decisive factor is the interpretation which a reasonable man would put upon the possessor's acts."); 2 Thomas M. Cooley, A Treatise on the Law of Torts or the Wrongs Which Arise Independently of Contract 634 (John Lewis ed., 3d ed. 1906) ("Lawful license to enter one's premises may be given either, 1. Impliedly by the owner; 2. Expressly by the owner; 3. By the law."); Heuston, *supra*, § 110, at 891 (stating that "[a] licensee, at common law, is one who enters on the premises by the permission of the occupier, granted gratuitously in a matter in which the occupier has no interest" and that "[a] licen[s]e may be granted either expressly or impliedly" (footnote omitted)); Glen Weissenberger & Barbara B. McFarland, The Law of Premises Liability §3.02[2], at 3-6 (4th ed. 2010) ("While a visitor, to be classified as a licensee, must have the possessor's permission to enter or remain upon the land, this consent need not be express, but may be implied from words or conduct if they manifest the possessor's willingness.").

without the landowner's objection," and "[p]ersons selling goods or soliciting contributions, or distributing religious literature." 13 Robert E. Draim & David D. Hudgins, Virginia Practice Series: Tort and Personal Injury Law § 7:4, at 248 (2019-2020 ed.) (footnotes omitted).

The common-law definition of "licensee" includes every user individually listed in subsection B (hunters, skydivers, campers, foxhunters, hang gliders, inter alia). But it also includes the subsection B catch-all category of "any other recreational" users in addition to those individually listed. A target shooter is a recreational user and thus falls within the catch-all category of subsection B and is incorporated by reference into subsection C. This interpretation is compelled by the traditional common-law concept of a licensee. The majority ironically concedes this point by invoking Restatement (Second) of Torts § 318 as the sole common-law basis for imposing liability on the grandparents for Nicely's negligence. *See ante* at 8-9. That section is entitled, "Duty of Possessor of Land or Chattels to Control Conduct of *Licensee*." Restatement (Second) of Torts § 318 (emphasis added). Nicely, a target shooter, was a licensee.

While finding it easy to deem the target shooter a licensee for purposes of holding the grandparents liable, the majority finds it impossible to deem the target shooter a licensee for the purposes of third-party immunity under Code § 29.1-509(C). The majority attempts to resolve this dilemma by invoking the strict-construction canon to interpret "license," and thus licensee (a user with a license), to apply exclusively to two groups of licensees in subsection B: those seeking "passage to other property used for recreational purposes" or those using an "easement granted to the Commonwealth or any agency thereof or any not-for-profit organization" to access public recreational land. *Ante* at 14. The majority's analysis abruptly ends there: Only travelers passing through the property are licensees using a "license as set forth in subsection B," Code

§ 29.1-509(C). Excluded from the definition of licensee are the multitude of recreational users within the catch-all subsection B category for "any other recreational use."

Despite its avowed intention to protect the common law, the majority's approach reduces to a sliver the broad common-law definition of license and limits it to apply to only a narrow set of licensees. The very definition of license that the common law has employed for centuries is being rejected in order to prevent a statutory "derogation of the common law," *ante* at 10 (citation omitted). Neither logic nor legal precedent persuades me to accept this argument. Instead, I would begin the analysis with the common-law definition of license and conclude that subsection C's incorporation by reference (any person using a "license as set forth in subsection B") includes target shooters within the scope of subsection B's catch-all provision (any person on the property "for any other recreational use"). That "any other" modifier renders irrelevant the majority's speculative justification for refusing to give landowners the same immunity for target shooters as for hunters.

### b. Reading the Statute as a Whole — Necessary Implication

The strict-construction canon only applies to statutory ambiguities. *See Citizens' Bank of La. v. Parker*, 192 U.S. 73, 85-86 (1904) (noting that the "proper office" of the rule of strict construction "is to help solve ambiguities"). The presumption that the common law has not been abrogated is rebutted when the "express language" of a statute read "as a whole" makes clear that the General Assembly intended to modify or abrogate the common law. *Isbell*, 273 Va. at 618. The same is true when a holistic reading of the statute reveals this intent through a "necessary implication." *Id.*; *see also Tvardek v. Powhatan Vill. Homeowners Ass'n*, 291 Va. 269, 276 n.4 (2016). Such a necessary implication exists in this case.

The story line of the recreational-use statute spans 49 years and 19 amendments. To understand the last act that amended subsection C — the 2010 amendment that we are called upon to interpret in this case — we must consider all the amendments that preceded it. The doctrine that statutes should be construed in pari materia, often employed horizontally to related statutes, is equally applicable vertically to former legislative enactments for the same statute. "Statutes may be in pari materia whether independent or amendatory in form," and "it has been allowed that 'an amendatory act shall be construed in context with the act which it is designed to amend,'" thus allowing consideration of "[a]ntecedent legislative enactments" when construing "amendatory acts in pari materia." *See* 2B Norman J. Singer & J.D. Shambie Singer, Sutherland's Statutes and Statutory Construction § 51:3, at 236-39, 236 n.10, 239 n.21 (7th ed. 2012) (citation omitted); *cf.* Earl T. Crawford, The Construction of Statutes § 216, at 386 (1940) ("If the law to be construed is the result of amendment, a consideration of the old law with the new must surely reveal a legislative aim or purpose.").

This principle has been part of Virginia law for over two centuries. *See Dilliard v. Tomlinson*, 15 Va. (1 Munf.) 183, 206 (1810) (opinion of Roane, J.). Judge Roane explained that a former statute "*although long since expired*, [ought] to be taken into consideration in construing the latter statute, for that it is a rule, that all statutes which relate to the same subject, notwithstanding some of them are expired, or not referred to, must be taken as one system, and construed consistently." *Id.* (emphasis added) (quoting 6 Matthew Bacon, A New Abridgment of the Law 383 (Henry Gwillim ed., 5th ed. 1798)). When we apply that principle in this case, the takeaway is compelling: At nearly every turn prior to 2010, the General Assembly expanded the scope of the user immunity in subsection B and made repeated efforts to sync it with the third-

34

party immunity in subsection C. The majority's interpretation of the 2010 amendment is inconsistent with this longstanding and clearly expressed legislative intent.

To demonstrate this point, I must chronicle the long and winding road that led to the 2010 amendment. When first enacted nearly half a century ago, the recreational-use statute, former Code § 8-654.2, covered a limited list of recreational uses: hunting, fishing, trapping, camping, and hiking. The landowner owed hunters, fishers, trappers, campers, or hikers who had permission to use the property "no duty to keep the premises safe for entry or use." 1962 Acts ch. 545, at 874. In perfect congruence, the statute provided a similar immunity to landowners for injuries to third parties "caused by the negligent acts" of the listed recreational users to whom permission had been granted. *See id.* User immunity and third-party immunity both applied to the same recreational uses.

In 1964, the legislature divided the provisions for user immunity and third-party immunity into separate subsections and extended the statute's protection to users involved in "water sports" and "sightseeing." 1964 Acts ch. 435, at 708 (former Code § 8-654.2(b) (1964)). Consistent with the intended symmetry of the original act, the amendment provided expanded immunity to landowners for injuries to third parties "caused by the negligent acts" of swimmers and sightseers. *See id.* (former Code § 8-654.2(c)(3) (1964)). In 1979, the General Assembly again amended the recreational-use statute to further expand its scope. *See* 1979 Acts ch. 276, at 377. The amendment expanded the landowner's user immunity for simple-negligence claims to cover injuries to recreational users engaging in "horseback and bicycle riding." *Id.* (former Code § 29-130.2(b) (1979)). And, once again, the amendment expanded the corresponding third-party-immunity provision to include users who "ride" on the landowner's property. *Id.* (former Code § 29-130.2(c)(3) (1979)). The process of expanding the statute's reach continued in 1980

35

when user immunity was extended to users who "participat[e] in water sports," "hang gliding, skydiving," and "collecting, gathering, cutting, or removing of firewood," and third-party immunity was extended to all of those uses except participation in water sports. 1980 Acts ch. 560, at 766-67.

A similar expansion occurred in 1982 when the legislature added "boating" to the list of recreational uses triggering the dual immunities. 1982 Acts ch. 29, at 128. The user-immunity provision applied to users injured while "boating," and the third-party-immunity provision applied to those injured by users who "launch and retrieve boats" on the landowner's premises. *Id.* The 1982 amendment was also notable because the General Assembly discovered an apparent flaw in its previous efforts to keep the dual immunities symmetrical. The 1982 amendment added users who "fish" to the third-party-immunity provision. *Id.* The protection for fishing had existed for both user and third-party immunity in the original 1962 statute but was omitted from third-party immunity in the 1964 amendment when the two immunity categories were separated into different subsections. *Compare* 1962 Acts ch. 545, at 874, *with* 1964 Acts ch. 435, at 708.[10]

In 1987, the statute was renumbered, substantially reorganized, and again expanded. The definition of "[l]andowner" now included a "legal title holder, lessee, occupant or any other person in control of land or premises." 1987 Acts ch. 488, at 695 (former Code § 29.1-509(A) (1987)). More important for our purposes, however, is that the extensive rewriting of the statute preserved the dual immunities in sync — the landowner's user immunity paralleled his third-party immunity.

---

[10] A subsequent 1983 amendment also made clear that the dual immunities applied even if the injuries occurred on property "not routinely used" for one of the specified recreational uses. *Compare* 1983 Acts ch. 283, at 330, *with* 1979 Acts ch. 276, at 377.

In 1988, "point-to-point racing" was added to the list of recreational uses covered by the dual immunities. 1988 Acts ch. 191, at 226. Likewise, "rock climbing" was added to the list of recreational uses for both immunity provisions in 1989. 1989 Acts chs. 26, 505, at 53, 741.

In an apparent effort to end the need to continue itemizing specific recreational uses protected by the statute, the General Assembly in 1989 extended the landowner's user immunity in subsection B to users on the property engaged in "any other recreational use." 1989 Acts ch. 505, at 741. In doing so, the legislative drafters left intact the previous list of recreational uses, such as boating, hiking, and sightseeing, inter alia. The most reasonable explanation for this redundancy is that the General Assembly intended the statute to be unambiguously broad. The 1989 amendment, however, had a notable omission. The third-party-immunity provision in subsection C did not include the same catch-all category ("any other recreational use") that was mentioned in subsection B. *See id.* How the legislature ultimately corrected this omission is in my view the whole question before us. To answer that question, the statutory tale must go on.

Despite the fact that "hunting" had been a recreational use since the inaugural statute in 1962 and the fact that the statute now included a catch-all for "any other recreational use" in the user-immunity provision, the General Assembly in 1992 specifically listed "foxhunting" as a recreational use triggering the dual immunities. 1992 Acts ch. 285, at 358. Though seemingly purposeless, the 1992 amendment created a redundancy that reinforced the legislature's intent for the statute to be broadly interpreted rather than linguistically dissected to limit the scope of the landowner's immunity.

Two years later, the legislature again expanded the dual immunities by adding a non-recreational category of user — those using a state-owned "easement" to allow "access to a public park, historic site, or other public recreational area" — to the list of users in subsection B

37

who could not sue the servient-estate landowner for simple negligence. 1994 Acts ch. 544, at 768. Again, coupling the user and third-party immunities, subsection C protected the servient-estate landowner from any liability for the acts of those using the "easement as set forth in subsection B." *Id.*

This lengthy storyline regarding the dual-immunity provisions ends in 2010 when the legislature again amended the statute. One new provision expanded the third-party immunity under subsection C to include any use of an easement "*or license* as set forth in subsection B." 2010 Acts ch. 43, at 40 (italicizing amendment). Another amendment to subsection C reinforced that users on the property with the landowner's permission do not become either an "invitee *or licensee* to whom a duty of care is owed." *Id.* (italicizing amendment). The General Assembly also made two additions to the user-immunity provision in subsection B. The first addition extended user immunity to a landowner's property if others used it while seeking passage to and from "other property used for recreational purposes." *Id.* The second addition extended user immunity to all persons on the landowner's property for any of the specified uses *even if* the users were on the property without the landowner's "permission." *Id.*

In short, the nearly half-century evolution of this statute shows at every turn that the General Assembly continuously expanded the landowner's dual immunities to protect landowners from common-law claims of simple negligence and made repeated efforts to harmonize the user-immunity provisions of subsection B with the third-party-immunity provisions of subsection C. Every such expansion was and still is an abrogation of the common law to the extent that one could raise a simple-negligence claim arising from the covered uses. The "necessary implication," *Isbell*, 273 Va. at 618, is clear: The amendments adding an unlimited catch-all category to subsection B ("any other recreational use") and later syncing

38

subsection C with that catch-all category through an incorporation by reference (any user with a "license as set forth in subsection B") necessarily implies that the General Assembly intended to do what it had done scores of times in the past — extend a limited-liability immunity to landowners for claims by recreational licensees of their property or by third parties injured by those users.

## 2. The Superfluity Argument

The majority laces together its interpretative arguments with another canon of construction with which I fully agree but also find inapplicable to this case. Courts presume that legislative drafters favor an economy of words and, thus, "[w]ords in a statute should be interpreted, if possible, to avoid rendering words superfluous." *Cook v. Commonwealth*, 268 Va. 111, 114 (2004); *see Davis ex rel. Woodside Props., LLC v. MKR Dev., LLC*, 295 Va. 488, 494-95 (2018). Avoiding statutory surplusage is a mere interpretative presumption, however, "not a silver bullet," *Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 881 (2019), or "an absolute rule," *Marx v. General Revenue Corp.*, 568 U.S. 371, 385 (2013). "Sometimes the better overall reading of the statute contains some redundancy." *Barton v. Barr*, 140 S. Ct. 1442, 1453 (2020) (citation omitted).

To be sure, "[l]egislative drafters often use apparently redundant language in order to emphasize that a broad delegation may not [be] evaded so as to frustrate a statute's purpose." *Sabre, Inc. v. Department of Transp.*, 429 F.3d 1113, 1122 (D.C. Cir. 2005); *see Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1074 (2018) (noting that there are "many examples of Congress legislating in [a] hyper-vigilant way, to 'remov[e] any doubt' as to things not particularly doubtful in the first instance" (citation omitted)). "The canon against surplusage is not a straitjacket. It should not, therefore, be employed inflexibly to rule out every

interpretation of a statute that treats certain language as illustrative or clarifying." *City of Providence v. Barr*, 954 F.3d 23, 43 (1st Cir. 2020)). "Sometimes drafters *do* repeat themselves and *do* include words that add nothing of substance," Scalia & Garner, *supra*, at 176-77 (emphases in original), and such a "belt and suspenders approach" to statutory drafting is not at all unusual, *Atlantic Richfield Co. v. Christian*, 140 S. Ct. 1335, 1350 n.5 (2020).

Making fulsome use of the superfluity canon, the majority declares that "[i]t would make no sense to construe the word 'license' to cover *all* the activities mentioned in subsection B," *ante* at 13 (emphasis added), even though the common-law meaning of license would include every one of those activities. Instead, the majority says that the word "license" in subsection C covers just *one* category of licensees in subsection B — those who pass through the landowner's property in order to get to another's property to recreate. Under this logic, the word "license" does not cover hunters, who are specifically mentioned in subsection B, or target shooters, who are within subsection B's catch-all for "any other recreational" users. But it does cover those simply passing through.

The express text of Code § 29.1-509, however, shows that the General Assembly adopted a belt-and-suspenders drafting strategy to avoid exactly the kind of crabbed interpretation that the majority now makes. Subsection B, after all, does the same thing that the majority refuses to permit subsection C to do. The 1989 amendment to subsection B broadened that subsection's reach to include "any other recreational use." *See* 1989 Va. Acts ch. 505, at 741. The legislature in 1989 could have easily deleted the specific list of recreational uses in subsection B and simply said "any recreational use." On the other hand, if the legislature were wedded to using the phrase "any *other* recreational use," then doing so would under the majority's logic render all but one (but which one?) of the following enumerated recreational uses redundant:

40

| | |
|---|---|
| ▪ hunting | ▪ sightseeing |
| ▪ fishing | ▪ hang gliding |
| ▪ trapping | ▪ skydiving |
| ▪ camping | ▪ horseback riding |
| ▪ water sports | ▪ foxhunting |
| ▪ boating | ▪ racing |
| ▪ hiking | ▪ bicycle riding |
| ▪ rock climbing | ▪ collecting, gathering, cutting, or removing firewood |

Similarly, the legislature in 2010 could have just as easily deleted the specific list in subsection C (hunting, fishing, inter alia) and simply referred to the use of a "license as set forth in subsection B." As observed earlier, the catch-all provision in subsection B included every common-law licensee on the property for a recreational use.

I believe that the legislative drafters of Code § 29.1-509 understood that to enact and extend a statutory immunity against common-law liability would require a clear expression of the intent to do so. They attempted to accomplish that goal in subsection B by using an obvious redundancy: a long list of specific recreational uses followed by a catch-all provision covering all other recreational uses. To keep subsection C in sync with subsection B — consistent with the statute's long and documented history — the drafters created another redundancy in subsection C by providing a long list of specific recreational uses followed by a catch-all provision incorporating all licenses covered by subsection B.

The majority's approach might have some traction if it were necessary to avoid an anomalous application of Code § 29.1-509. Just the opposite is true, however. Under the majority's reasoning, a landowner would be immune from simple-negligence claims by scores of recreational-use licensees *not* specifically mentioned in subdivision B, such as paint-ballers, kite-flyers, flag-football players, skateboarders, ATV riders, and any other licensees engaged in a

recreational use of the property. But the same landowner will not be immune from claims by third parties for injuries caused by the negligence of any of those licensees not specifically mentioned. That immunity, according to the majority, is reserved exclusively for those licensees, unmentioned in subsection C, who do *not* intend to use the landowner's property for a recreational use but are simply passing through to use another property for a recreational use.

In short, the text, structure, and 49-year history of amendments to Code § 29.1-509 demonstrate that the General Assembly intended subsections B and C to operate in tandem. Recreational uses permitted by the landowner trigger both the user immunity of subsection B and the third-party immunity of subsection C. The target shooter in this case was a common-law licensee with permission from his grandparents to target shoot on their property. His conduct fell within the incorporation by reference in subsection C because it fell within the catch-all provision of subsection B.

### 3. Licensees v. Non-Licensees

"Additionally," the majority observes, Code § 29.1-509(C)'s catch-all phrase refers to users with permission and a "license set forth in subsection B," but subsection B applies not only to licensees but also non-licensees without permission that use the land for recreational purposes. *Ante* at 14. The majority believes this difference supports the conclusion that subsection C cannot possibly refer to licensees "engage[d] in one of the listed recreational activities" in subsection B. *Ante* at 14. I do not see the logic in this conclusion. Shoemaker's administrator apparently does not either, as she has never made this argument in the circuit court or on appeal.

The majority's argument is unconvincing because subsection B provides user-immunity to landowners for injuries to any user of the property engaged in a recreational use, whether they are licensees with permission or uninvited individuals using the property without permission.

Subsection C provides immunity to landowners for injuries to third parties caused by recreational users who have "permission, express or implied," from the landowner. Subsection C(2) then confirms that a licensee with a "license as set forth in subsection B" is not owed a common-law "duty of care" simply because he has been given "permission" to be on the property. The relation between these phrases in subsection C and C(2) is evidenced by the fact that the term "licensee" was added to subsection C(2) in 2010 at the same time that "license as set forth in subsection B" was added to subsection C.

Subsections B and C fit together perfectly. Subsection B provides user immunity for injuries to both licensees *and* non-licensees. Subsection C provides third-party immunity for injuries caused by any recreational licensees covered by subsection B. And subsection C(2)'s reference to owing no duty to covered licensees (those "with permission, express or implied") reinforces subsection B's user immunity by disclaiming any duty of care ordinarily owed to these covered licensees under common law. I thus find no merit in the majority's view that these provisions necessarily mean "that the 'license set forth in Subsection B' cannot be a license to engage in one of the listed recreational activities." *Ante* at 14.

III.

In sum, I believe that the majority has misapplied common-law principles governing a landowner's duty to control a licensee and has misinterpreted the recreational-use statute. The first mistake imposes liability on the grandparents who were not present with Nicely when he committed the tort, and the second mistake deprives them of their statutory immunity from suit that the General Assembly has provided to landowners who permit recreational licensees to use their property.

I respectfully dissent.

43